**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

IN RE: THE MALL AT THE GALAXY, Debtor.

LATOC, INC.,

    *Appellant*,

  v.

STEVEN P. KARTZMAN,

    *Appellee*.

Civil Action No. 22-2859

**OPINION**

**John Michael Vazquez, U.S.D.J.**

   This matter comes before the Court on Latoc, Inc's. appeal of the April 29, 2022 final judgment of the United States Bankruptcy Court entered by the Honorable Vincent F. Papalia, U.S.B.J.  D.E. 1.  Appellant ("Latoc") filed a brief in support of its appeal (D.E. 6), and Appellee Steven P. Kartzman (the "Trustee") filed a brief in opposition (D.E. 7).  The Court reviewed the parties' submissions,[1] and decided the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b).  For the reasons set forth below, the bankruptcy court's judgment is **AFFIRMED**.

---

[1] Latoc's brief is referred to as "Latoc Br." (D.E. 6); the Trustee's brief is referred to as "Trustee Br." (D.E. 7); and Latoc's reply is referred to as "Latoc Reply" (D.E. 8).

# I.   BACKGROUND[2]

This matter stems from the bankruptcy proceeding of The Mall at the Galaxy, Inc. (the "Debtor" or the "Mall").  Since 1986, the Debtor's line of business was leasing commercial units at real property it owned in Guttenberg, New Jersey.  A2869.  The Mall was operated by Martin Sergi, who served as its President, Treasurer, and board member.  A2869.  Sergi had been a 90% owner of the Mall since 1997.  A2869.  He also held equity interests in and served as an officer, director, and/or board member of other entities engaged in the rubber recycling business, including (i) PermaLife Products, LLC ("PermaLife"); (ii) Bristow Rubber Recycling ("Bristow"); (iii) New York Rubber Recycling ("NYR"); (iv) Arizona Rubber Recycling LLC ("Arizona"); (v) Piedmont Rubber Recycling, LLC ("Piedmont"); and (vi) PermaLife Internet, LLC ("PLI") (collectively, the "PermaLife Entities").  A2869.  Also involved with the PermaLife Entities were Dibo Attar ("D. Attar"), and his son, Raffaele Attar ("R. Attar") (collectively, the "Attars").  R. Attar served as a director of PermaLife until shortly before it filed for bankruptcy protection with other PermaLife Entities in 2009.  A2869-70.  He also served as the President of Latoc and of Better Half Bloodstock (which held an equity interest in PermaLife) during the relevant period.  A2870.

In September 2007, PermaLife was in need of funding, in large part due to a fire that occurred at its Arizona facility, which resulted in significant damage.  A2870.  PermaLife turned to the Attars for financing, but because of R. Attar's conflicting roles with the prospective borrower (PermaLife) and the lender (Latoc), the PermaLife Board would not approve borrowing from an

---

[2] The facts recited herein are drawn from the bankruptcy court's opinion and have been reviewed for clear error.  *See* D.E. 6-19 at A2866-A2920; *see also In re Mall at the Galaxy, Inc.*, No. 10-12435, 2022 WL 1299088 (Bankr. D.N.J. Apr. 29, 2022).  Citations to the opinion (included in the appendices at A2866-A2920) incorporate by reference the bankruptcy court's citations to the underlying submissions, including, but not limited to, the parties' joint stipulation of undisputed facts, trial and deposition testimony, affidavits, and related exhibits.

2

Attar-affiliated entity, such as Latoc.  A2870.  A loan from Latoc to PermaLife was also restricted by the terms of a loan that PermaLife had with Gemini Investors IV, L.P. ("Gemini Loan"). A2870.

Thus, to facilitate the loan and manage the conflict that precluded a direct loan to PermaLife, Latoc entered into a $2 million loan agreement with the Debtor (the "Loan" or the "Latoc Loan").  A2870-72.  This loan was evidenced by a promissory note, dated November 15, 2007 (the "Note").  A2870-71.  D. Attar and Sergi had discussed the Loan in September 2007 (the same month that the fire had occurred) while they were on vacation together in Italy.  A2870.  The proceeds of the $2 million loan (the "Loan Proceeds") were deposited into Debtor's bank account through multiple disbursements, made from October 2007 (about one month prior to the Note being signed) through May 2008.  A2871.  Upon receipt of each disbursement, all or virtually all of the Loan Proceeds were immediately transferred from the Debtor to various PermaLife Entities, all of which were entities that Sergi and the Attars controlled and/or held an ownership interest. A2871.  The Mall and the PermaLife Entities did not enter into any written agreement regarding the transfer of the Loan Proceeds or how they would be repaid to the Mall.  From February 2008 to September 2009, the Mall sent Latoc $592,875.03 towards repayment of the Loan.  A2871.

## II.    BANKRUPTCY PROCEEDINGS

On January 28, 2010, the Debtor filed a voluntary petition for relief under Chapter 11, which was converted to a case under Chapter 7 on June 1, 2011.  A2874.  Steven Kartzman was appointed to serve as the Chapter 7 Trustee (the "Trustee").  A2867.  On July 30, 2012, the Trustee instituted an adversary action to avoid and recover the $592,875.03 that the Debtor made in Loan repayments to Latoc, contending that such payments were fraudulent transfers under 11 U.S.C. §§

548(a)(1)(B), 544(b)(1), and N.J.S.A. §§ 25:2-25a(2), 25:2-27a (the "Pre-Petition Transfers").[3] A2874; A2888.  On April 4, 2019, following a three-day trial, the bankruptcy court concluded that the Pre-Petition Transfers could be avoided and entered final judgment in favor of the Trustee.  *In re Mall at the Galaxy, Inc.*, No. 10-12435, 2019 WL 1522703 (Bankr. D.N.J. Apr. 4, 2019), *aff'd in part, rev'd in part and remanded sub nom. In re Mall at the Galaxy, Inc.*, No. 19-10340, 2020 WL 1847667 (D.N.J. Apr. 9, 2020).  The bankruptcy court reasoned that such transfers "were constructively fraudulent because the Debtor did not receive reasonably equivalent value for the transfers" (as had been determined at the summary judgment stage), and because "the Debtor was insolvent at the time of each of the transfers."[4]  *Id.* at *1.

Latoc appealed the bankruptcy court's final judgment and prior grant of partial summary judgment on the issue of reasonably equivalent value.[5] A2877.  On appeal, the Court held that the bankruptcy court erred in granting partial summary judgment on the issue of reasonably equivalent value and reversed and remanded solely on that basis.  *In re Mall at the Galaxy*, No. 19-10340, 2020 WL 1847667, at *1 (D.N.J. Apr. 9, 2020).  The Court explained that the bankruptcy court improperly focused on whether the Debtor received reasonably equivalent value when it

---

[3] The adversary complaint was followed by amended complaints on October 24, 2014 and May 12, 2016.  A2874.

[4] Prior to the trial, the bankruptcy court granted partial summary judgment in favor of the Trustee on the issue of reasonably equivalent value, finding that the Debtor received less than reasonably equivalent value for the Latoc Loan and its Pre-Petition Transfers to Latoc.  A2876.  The Trustee had also moved for partial summary judgment on the issue of insolvency at the time of the Pre-Petition transfers, which the bankruptcy court denied, finding that there was a triable issue as to insolvency during the period from October 2007, when the first advance was made under the Latoc Note, to February 2009.  A2876.

[5] Latoc also appealed two other orders that were entered prior to the final judgment: an order barring the amendment of Appellant's answer to include certain affirmative defenses, and an order permitting certain expert testimony.  A2877 n.42.

transferred the Loan Proceeds to the PermaLife Entities, rather than whether the Debtor received reasonably equivalent value from the $2 million Loan made by the Debtor to Latoc. *Id.* at *5. In other words, the "critical question" for the bankruptcy court on remand was "whether the $2 million was actually a loan to the Debtor or whether the Debtor was merely a conduit, or pass-through, to get the $2 million to the PermaLife Entities." *Id.* Because "[i]f the Debtor was a mere conduit, then it did not receive *any* value, and the Pre-Petition Transfers would also not reflect reasonably equivalent value." *Id.*

On remand, the bankruptcy court conducted a two-day trial on the issue of reasonably equivalent value, during which it considered:

> (i)    whether the Debtor was a "pass through" or "mere conduit" for the $2 million loan proceeds; and
>
> (ii)   whether the facts adduced at trial concerning the knowledge and intent of the parties in interest allow the [c]ourt to disregard the mediate transfer to the Debtor and to collapse the loan transactions from Latoc to the PermaLife Entities.

A2884-85.[6]  Latoc asserted that it was not aware of the purpose of the Loan and that the Loan did not restrict or limit how its proceeds would be used.  A2871, A2873, A2885.  Latoc also argued that the Debtor sought the financing from Latoc to fund its acquisition of, and investments in, its alleged subsidiaries to provide a "continued existence" for the Debtor.  A2885.  The bankruptcy court did not find these assertions credible in light of the facts and circumstances surrounding the Loan, including the timing of the Loan, which came shortly after the fire at PermaLife and after a direct loan to PermaLife from the Attars (or their entities) had been rejected; the discussions

---

[6] The bankruptcy court relied on the parties' joint stipulation of undisputed facts; each party's proposed findings of facts and conclusions of law and their respective responses; the testimony the trial witnesses (which included the Trustee's expert witness, Kenneth DeGraw, and Latoc's witnesses, Sergi and R. Attar); and the parties deposition testimony, affidavits, and exhibits. A2882-85.

between Sergi and the Attars as to PermaLife's need for funding after the fire; Sergi's explanation that the Loan was designed to "manage the conflict that precluded a direct loan" to PermaLife; the immediate and full disbursement of the Loan Proceeds by the Debtor to PermaLife and its affiliates as advances were made by Latoc; and the substantial and continuing business and personal relationships between Sergi and the Attars, including their common interests in the PermaLife Entities. A2871-74. Such evidence, the court found, "point[ed] to a knowingly and intentionally structured transaction that allowed Latoc to do indirectly what it could not do directly—make a loan to the PermaLife Entities." A2872. And in the bankruptcy court's view, the lack of specific terms as to the use of proceeds in the Note was "more indicative of the close business and personal relationships between Mr. Sergi and D. Attar, rather than any lack of knowledge by Latoc as to how the Loan Proceeds would be used." A2873-74.

On April 29, 2022, the bankruptcy court entered a final judgment in favor of the Trustee, finding that the Debtor did not receive reasonably equivalent value for either the $2 million loan or the $592,875.03 repayment of the loan, and that both are therefore avoided as constructively fraudulent transfers under 11 U.S.C. 11 U.S.C. §§ 548(a)(1)(B), 544(b)(1), applying N.J.S.A. §§ 25:2-25a(2), 25:2-27a. A2915-16. The bankruptcy court also determined that

> it is appropriate to collapse the Latoc Loan transaction into one that was made with the knowledge and direct involvement of the lender, Latoc, and which was an intermediate step in the plan to fund the PermaLife Entities indirectly through the Debtor after the direct loan from Latoc to these entities was rejected.

A2908. Accordingly, the bankruptcy court found that the Note and Pre-Petition Transfers, plus pre-judgment and post-judgment interest, may be recovered by the Trustee against Latoc for the benefit of the estate. A2916. The instant appeal followed.

## III.     APPELLATE JURISDICTION

A district court has appellate jurisdiction over the final judgments, orders, and decrees of a bankruptcy court. 28 U.S.C. § 158(a)(1). When sitting as an appellate court reviewing a decision of the bankruptcy court, the district court "review[s] the bankruptcy court's legal determinations *de novo*, its factual findings for clear error and its exercise of discretion for abuse thereof." *In re United Healthcare Sys., Inc.*, 396 F.3d 247, 249 (3d Cir. 2005) (quoting *In re Trans World Airlines, Inc.*, 145 F.3d 124, 130-31 (3d Cir. 1998)).   "Mixed questions of law and fact must be divided into their respective components and the appropriate test applied."  *In re Thorpe*, 755 Fed. Appx. 177, 179 (3d Cir. 2018) (internal quotation marks and citations omitted).  "Findings of fact are not clearly erroneous unless they are completely devoid of minimum evidentiary support displaying some hue of credibility or bear no rational relationship to the supportive evidentiary data." *In re Fiber-Span, Inc.*, 40 F.4th 79, 93-94 (3d Cir. 2022) (internal quotation marks and citations omitted); *see also* Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.").

## IV.     ANALYSIS

Latoc argues on appeal that the bankruptcy court erroneously found (1) that the Debtor did not receive reasonably equivalent value for the Latoc Loan; and (2) that it was appropriate to treat the Loan from Latoc to the Debtor and subsequent transfers from the Debtor to the PermaLife Entities as a single, integrated transaction.  Latoc Br. at 8-24.  Latoc also argues that the bankruptcy

court abused its discretion in awarding prejudgment interest to the Trustee.[7]  *See* Latoc Br. at 24-25.

### A.  Reasonably Equivalent Value

Pre-petition transfers can be avoided if there is actual fraud or, as applicable here, constructive fraud.  Whether reasonably equivalent value was received for the transfer is one aspect of the analysis of whether a transfer was constructively fraudulent.    11 U.S.C. § 548(a).[8]  The

---

[7] The arguments listed by Latoc in its Statement of Issues on Appeal, D.E. 2-2, are inconsistent with those that were briefed.  The Court only considers the issues that were briefed.

[8] The relevant statute provides as follows:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> . . .
>> (B)(i) received *less than a reasonably equivalent value* in exchange for such transfer or obligation; and
>> (ii)(I) *was insolvent* on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1) (emphases added).

Third Circuit applies a two-step test to determine whether a transferor received reasonably equivalent value. *In re R.M.L.*, 92 F. 3d 139, 148-49 (3d Cir. 1996).[9]  The first step is to "make an express factual determination as to whether the debtor received any value at all." *Id.* at 149. This value need not be direct, tangible, or even easily quantifiable. *See id* at 151.  In the case of investments made by a debtor that turn out to be unsuccessful, the court must determine whether, at the time of the transaction, "it was 'legitimate and reasonable' to expect some value [to accrue] to the debtor.'" *In re Princeton Paper Prods.*, No. 9-19782, 2015 WL 9700940, at *7 (Bankr. D.N.J. Nov. 6, 2015) (citing *In re Autobacs Strauss Inc.*, 473 B.R. 525, 568 (Bankr. D. Del. 2012)).

If it has been established that some value has been conferred, the court applies a totality of the circumstances test to determine whether this value was reasonably equivalent to the amount transferred. *In re R.M.L.*, 92 F.3d at 153.  This evaluation can consider, among other factors, the fair market value received by the debtor, the arm's-length nature of the transaction, and the transferee's good faith. *In re Fruehauf Trailer Corp.* 444 F. 3d 203, 213 (3d Cir. 2006) (citing *In re R.M.L.*, 92 F.3d at 148-49, 153)).  Indeed, "reasonably equivalent value is not an esoteric concept: a party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'" *VFB, LLC v. Campbell Soup Co.,* 482 F.3d 624, 631 (3d Cir.2007) (citing *In re Fruehauf Trailer Corp.* 444 F. 3d at 213 (3d Cir. 2006); *Mellon Bank NA v. Metro Commn'cs, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991)).  Thus, "the court must engage in a fact-driven comparison between such value and the transfer sought to be avoided to determine 'whether the debtor got

_____

[9] The analysis for determining whether the debtor received reasonably equivalent value is the same under New Jersey law. *In re Aspect Computer Corp.*, No. 9-5023, 2011 WL 4550187, at *3 (D.N.J. Sept. 29, 2011) (citing *VFB, LLC v. Campbell Soup Co.,* 482 F.3d 624, 631 (3d Cir.2007)).

roughly the value it gave.'" *In re AmCad Holdings, LLC,* 579 B.R. 33, 41 (Bankr. D. Del. 2017) (citations omitted).

The burden is on the party bringing the fraudulent conveyance action—here, the Trustee— to prove by a preponderance of the evidence that the transfer resulted in no value for the debtor or that the value received was not "reasonably equivalent" to the value of the relinquished property interest.  *In re Fruehauf Trailer Corp.*, 444 F.3d at 210-11 (citing *In re R.M.L.*, 92 F. 3d at 144)). This question must be viewed "from the standpoint of the creditors" based on the circumstances that existed at the time of the transfers, and the court must look to the substance of the transaction, rather than its form, to determine whether a fraudulent transfer has occurred.  *In re R.M.L.*, 92 F.3d at 150; *see also* A2891 (quoting 5 COLLIER ON BANKRUPTCY ¶ 548.03[6], at 548-57 (16th ed.) ("Fraudulent transfer law has always exalted substance over form.")).  Because determinations about reasonably equivalent value are "more often than not [] bound up in the bankruptcy court's factual determinations," the Third Circuit has explained that they are "largely immune from attack on appeal . . . as it should be; the bankruptcy court, with its unique expertise, is in far better position than either the district courts, sitting in appellate tribunals, or the courts of appeal to make such determinations."  *In re RML, Inc.*, 92 F.3d at 154.

Here, the bankruptcy court found that the Trustee "met his burden in proving that the Debtor was a 'mere conduit' or 'pass through, to get the $2 million to the Permalife Entities,'" and that the Debtor therefore "did not receive value or reasonably equivalent value for the Latoc Loan." A2891, A2905.  The Court finds sufficient support in the record for these findings.

As to the first step—whether the Loan conferred any value on the Debtor—Latoc argued on remand, and again argues on appeal, that the Debtor sought financing from Latoc to fund its acquisition of and investments in its alleged subsidiaries, Piedmont and PLI.  A2885; Latoc Br. at

13-16.  According to Sergi, the Debtor acquired these interests (a 100% interest in Piedmont and a 20% interest PLI) as a means for the Mall to "carry on as a business" after the last units of the mall were sold.  A2897; Latoc Br. at 12-13.[10]  Because the Debtor obtained these interests, Sergi continued, this "per se means that there was an intention to benefit the Mall," and that the investment was therefore "legitimate and reasonable."  Latoc Br. at 14, 16.[11]  But "[t]he only evidence offered by the Debtor or Latoc," as to the alleged ownership interests was a statement by Sergi to this effect.  A2899.  And this statement was "unsupported by any documents of any kind," and "in certain instances, contradicted by the record."[12]  A2899.  Notwithstanding the lack of proof as to ownership, the bankruptcy court considered whether, assuming the Debtor did hold such interests, it was "reasonable and legitimate" to expect a return on its alleged investments in

---

[10] Sergi also stated that another purpose of the Loan was "to provide additional funding to retrofit specific spaces" of the Debtor's property.  A2897.  The bankruptcy court did not credit this statement, as "there was simply no evidence presented at trial (or otherwise) that any of the proceeds were so used by the Debtor," because such proceeds were instead, "immediately transferred to the PermaLife Entities."  A2897-98.

[11] Latoc continues that it is "extremely naïve to conclude that the Mall received no benefit — none—from the 2 million dollars from Latoc" because "[t]he evidence is to the contrary."  Latoc Br. at 14-15.  However, rather than point to any contrary evidence, Latoc argues that the investment was legitimate and reasonable "regardless of the outcome."  Latoc Br. at 15-16.  The Court disagrees.  While an investment need not be successful for a court to find that it conferred value on a debtor, there must be "some chance that a contemplated investment will generate a positive return at the time of the disputed transfer" to find that value has been conferred.  *In re R.M.L.*, 92 F. 3d at 151-52.  Indeed, the goal is to protect creditors "when an irresponsible debtor invests in a venture that is obviously doomed from the outset."  *Id.* at 152.

[12] *See* A2898-99 ( "[E]ven after multiple summary judgment motions and two trials," "[n]o specific agreements, share certificates, membership interests, or other evidence" indicating when the Debtor "acquired the alleged interests, how much it paid for them or any of the other details regarding the those transactions" were produced," thus the court "simply has no way of knowing—because of the lack of proof—" whether the proceeds were used to fund any alleged investment in these entities); *see also* A2899 (finding that the arguments as to alleged ownership interests were severely undercut by the Debtor's immediate distribution of the proceeds to the PermaLife Entities, which were in need of immediate funding).

these entities.  A2899, A2900.  The bankruptcy court concluded that it was not, in light of the "dire and deteriorating financial condition" of the entities.  A2900-03.

This finding is amply supported by the record, and thus, will not be disturbed on appeal. Relying on the stipulated facts, testimony, and exhibits, the bankruptcy court found that at the time the Latoc Loan was made to the debtor in October and November 2007:

- a direct loan from the Attar-affiliated entity (Latoc) had been rejected by the PermaLife Board due to the conflict of interest […].

- PermaLife did not have the funds to acquire, build, or operate the intended new facility needed as the result of the fire.

- PermaLife was experiencing multimillion-dollar losses in 2006 ($2.1 million), 2007 ($2.6 million) and 2008 ($5.2 million).[13]

- PLI showed losses of over $278,000 in 2007 and more than $561,000 in 2008.

- any profits that may have been made by PLI were paid to PermaLife rather than the Debtor, disregarding the Debtor's alleged ownership interest.

A2900.  The bankruptcy court also considered the Debtor's insolvency at the time.[14]  A2900. Notably, the Debtor had defaulted on its obligation to the Galaxy Towers Condominium Association, and as a result, a $622,864 judgment was entered against it on November 16, 2007— just one day after the Latoc Note was signed.  A2901.  Moreover, the Debtor was in default of its

---

[13] The bankruptcy court further found that PermaLife and its related entities defaulted on their $5 million loan from JP Morgan in the fall of 2008, and filed their own bankruptcy petitions in early 2009, which resulted in judgments in excess of $7 million.  A2900-01.  In addition, the proof of claims filed in the PermaLife bankruptcy matter demonstrated that PermaLife was in default of other obligations as well, including to Latoc.   A2901.

[14] The parties do not dispute that the Debtor was insolvent during the relevant period.  *See* A2886 n.70 ("Latoc did not appeal that portion of the Court's April 4, 2019 Opinion and Judgment that determined that the Debtor was insolvent during the entire Relevant Period (the Quarter ending December 31, 2007 to the Quarter ending September 30, 2009))."

obligations to Blue Sky around this time, resulting in a proof of claim for more than $8 million against the Debtor.  A2901.  The bankruptcy court also observed that, notwithstanding the Debtor's insolvency, Sergi attempted to characterize the transfer of the funds to the PermaLife Entities, without any repayment, as evidence of the Debtor's "generosity" towards these Entities.  A2900.

The bankruptcy court also addressed the Attars and Sergi's ownership and/or controlling interests in the PermaLife Entities, and concluded that

> [r]ather than making a "reasonable and legitimate' investment," the Debtor was used by [] Sergi and the Attars as a pass-through vehicle to get the badly and immediately needed funding to the PermaLife Entities—in which both had interests—when the PermaLife Entities were not able to obtain that funding on their own.

A2902.  Because this finding is supported by the record, the Court affirms.  *Cf. In re R.M.L., Inc.*, 92 F.3d at 154 ("[A]s long as there is support in the record for the bankruptcy court's conclusion . . . we must affirm.").

Notwithstanding its finding that the Debtor acted as a pass-through and thus received no value, the bankruptcy court proceeded to the second step, applying a totality of the circumstances test to determine whether the value received by the Debtor was reasonably equivalent to the amount transferred.[15]  A2891-99; A2903-05.  Relevant to the bankruptcy court's analysis were the following facts:

- The PermaLife Entities were in immediate need of substantial funding due primarily to a fire that severely damaged their Arizona facility.

---

[15] The Court's prior opinion stated that if a finding is made that the Debtor was merely acting as a conduit for Latoc to get the money to the PermaLife Entities, and thus received no value, there is no need to determine the "reasonably equivalent" value of the Loan.  *In re Mall at the Galaxy*, 2020 WL 1847667, at *5.  Nevertheless, because the bankruptcy court proceeded with the second step, and because Latoc's appeal conflates findings that were made with respect to the first and second steps, the Court addresses such findings and challenges.

- The principals of the Debtor and Latoc had common interests in the PermaLife Entities.

- PermaLife was incurring substantial losses at the time, as was PLI.

- When the PermaLife Entities went to the Attars for financing, they were rebuffed by the PermaLife Board because of the conflict between the Attars and PermaLife, as well as the restrictive provisions of the Gemini Loan.

- Shortly after that refusal, the PermaLife Entities were able to obtain that financing through the $2 million Loan from Latoc, albeit indirectly through the Debtor.

- That $2 million was immediately passed through by the Debtor to the PermaLife Entities.

A2891-92 (bullet points added).  Also relevant was Latoc's failure to address these material facts, "other than to argue generally that the funds were used to invest in and acquire the Debtor's alleged (but not proven) subsidiaries and provide the Debtor with a continued existence in a completely unrelated business—rubber recycling."  A2892.  The bankruptcy court rejected such an argument

for lack of proof and a failure to adequately explain why the Debtor would 'invest' $2 million in the PermaLife Entities (most of which were not even alleged to be Debtor subsidiaries) in an extremely short period of time, without any loan documents, when those entities were experiencing substantial financial issues of their own, and without using any of those Loan Proceeds to fund the Debtor's own financially strapped and insolvent business—the Mall at Galaxy.

A2892.[16]  The bankruptcy court further found Sergi's sworn statements "highly relevant and probative on the issue of reasonably equivalent value, both as to the structure of the transaction,

---

[16] The bankruptcy court also noted that Latoc's failed to address

(i) the common business interests of the principals of the Debtor and Latoc in the PermaLife Entities and the potential benefits they would both derive from propping up the likewise financially strapped businesses of the PermaLife Entities; (ii) the fact that the discussions relating to a loan from Latoc to the Debtor did not occur until after

and Mr. Sergi's (and the Attars') intent in entering into it." A2894. Indeed, Sergi himself explained in an affidavit in the PermaLink bankruptcy proceeding that

> [i]n order to facilitate the loan and manage the conflict that precluded a direct loan to PermaLife, Latoc made the loan to the Mall, which then transferred the proceeds to PermaLife and to [Piedmont], one of the Mall's subsidiaries . . . The loan proceeds were deposited into the Mall's accounts, and then I immediately transferred the proceeds to PermaLife's and Piedmont's accounts.

A2893. This explanation was further bolstered by Sergi's testimony that D. Attar "wanted to help PermaLife" because of the "terrible fire." A2894. And the bankruptcy court observed that once Sergi recognized that these statements were damaging, he did not disavow them, but rather testified that he would not have made them if he knew that they would be used against Latoc. A2895.

Finally, the bankruptcy court considered the timing and circumstances of the relevant events, including the discussions that occurred between Sergi and D. Attar the same month that the direct loan from Latoc to PermaLife was rejected; Sergi and the Attars' common interests in the PermaLife Entities; the immediate use of the proceeds to fund the PermaLife Entities; the substantial advances ($690,000) made nearly one month before the Latoc Note was signed; the Debtor's failure to use those funds for its operations or otherwise; and the Debtor's use of the funds

---

the direct loan to PermaLife by Latoc was rejected; (iii) the fact that Latoc began advancing substantial sums to the Debtor ($690,000) that were in turn immediately transferred to PermaLife even before the Latoc Note was signed; or (iv) the fact that most of the Latoc Loan Proceeds were provided to PermaLife Entities in which the Debtor did not have even an alleged ownership interest.

A2892. In the bankruptcy court's view, this further demonstrated the strength of the Trustee's case and Latoc's inability to explain these events "in any way other than what they show: that the Debtor was a mere conduit for the Latoc Loan and its Proceeds when the direct loan from Latoc to PermaLife failed." A2892-93.

it generated from unit sales and real estate tax refunds to pay its debt to Latoc, rather than its other creditors.  A2903-04.

Considering the totality of the circumstances, the bankruptcy court concluded that "the Debtor did not receive value or reasonably equivalent value for the loan."  A2905.  Instead, the Debtor "was a mere indirect 'pass-through' or 'conduit' for the Latoc Loan and its Proceeds, which were immediately advanced by the Debtor to its intended beneficiaries—the PermaLife Entities."  A2905.  This "resulted in substantial detriment to the Debtor and its creditors in the form of a $2 million obligation that the Debtor incurred while insolvent and that it was ultimately unable to repay."  A2905

On appeal, Latoc argues that the evidence at trial did not support this conclusion.  Latoc Br. at 10.  According to Latoc, the bankruptcy court gave too much weight to the Trustee's expert witness because it was Sergi who "was in a better position to evaluate the intangible benefits to the Mall."  Latoc Br. at 10-15.[17]   But a review of the bankruptcy court's opinion demonstrates that Judge Papalia relied primarily on Sergi's testimony—not the testimony of the Trustee's expert witness—to find that the Loan was intended to benefit the PermaLife Entities, rather than the Debtor.  *See, e.g.*, A2893-2896 (considering Sergi's under oath statements in evaluating whether the Debtor received reasonably equivalent value or merely acted as a pass-through); A2894 (finding that Sergi's "sworn statements [were] highly relevant and probative on the issue of reasonably equivalent value, both as to the structure of the transaction and Mr. Sergi's (and the Attars') intent in entering into it.").

---

[17] Latoc also attacks the credibility of the Trustee's expert witness, Kenneth DeGraw.  Latoc Br. at 14.  However, "the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility," Fed. R. Civ. P. 52(a)(6), and the Court does not find that the bankruptcy court erred in its credibility determinations.

Latoc further contends that the "Mall was not a conduit for the other entities under any definition," because "[t]he fact that the Mall held interests in the companies where the monies were directed per se means that there was an intention to benefit the Mall" because these Entities then "had a greater opportunity to flourish and profit." Latoc Br. at 14-16. Along similar lines, Latoc argues that the Mall received value because it "received money, it signed the Note, [and] it was obligated to pay back the money that it borrowed for its own purposes[,] which was to make investments in PermaLife Internet and Piedmont."[18] Latoc Br. at 18. But Latoc admits that the alleged ownership interests in the PermaLife Entities were not documented. Latoc Reply at 9. Indeed, Latoc asks the Court to rely exclusively on the testimony of Sergi to find that the Debtor held such interests—testimony that the bankruptcy court found was "either unsupported by the record or at least inconsistent" with Sergi's prior statements. A2897-98. Furthermore, Latoc does not address the "dire and deteriorating financial condition" of the PermaLife Entities at the time of the alleged investments, which led the bankruptcy court to conclude that "even if the Debtor did hold interests in Piedmont and/or PLI," "it was not reasonable and legitimate for the Debtor to expect a return on its alleged investment on those money-losing entities, many of which were soon headed into bankruptcy proceedings on their own." A2899, A2901.[19]

---

[18] Latoc argues this repeatedly. *See, e.g.*, Latoc Br. at 16, 18, 21 (concluding that because the Mall received the money, the Mall was not a conduit). However, as the Court noted previously, if "the Debtor was merely a conduit, or pass-through, to get the $2 million to the PermaLife Entities," as the bankruptcy court found here, "then it did not receive any value, and the Pre-Petition Transfers would also not reflect reasonably equivalent value." *In re Mall at the Galaxy*, 2020 WL 1847667, at *5. More basically, if the Court were to accept Latoc's argument, it would mean that an entity could never be a mere pass through if it actually received funds—but this argument overlooks the necessary first step in a conduit transaction—the pass-through entity must first receive what it then passes on.

[19] In support of its reasonably equivalent value arguments, Latoc relies primarily on two cases: *Mellon Bank NA v. Metro Commn'cs, Inc.*, 945 F.2d 635 (3d Cir. 1991) and *In re Fairchild Aircraft Corp.*, 6 F.3d 1119 (5th Cir. 1993). Br. at 15, 17-18; Reply at 9-12. But these cases do not bolster

Because Latoc fails to demonstrate that the record is "completely devoid of a credible evidentiary basis" for the bankruptcy court's factual findings, or that its factual findings "bear[] no rational relationship" to the supporting evidence, the Court affirms. *In re Fiber-Span, Inc.*, 40 F.4th at 93-94 (citations omitted).

### B. Collapse of Transaction

Latoc next appeals the bankruptcy court's findings that it was appropriate to treat the loan from Latoc to the Debtor, and the subsequent transfers to the PermaLife Entities, as a single, integrated transaction. Latoc Br. at 22-24. When a claim for fraudulent conveyance involves multiple transfers, the Court, in appropriate circumstances, may view the multiple transfers as an integrated transaction and "infer facts, intent, and notice gleaned from one part of a transaction into another." *In re DSI Renal Holdings, LLC*, 617 B.R. 496, 504-05 (Bankr. D. Del. 2020). This practice, called the "collapsed transaction doctrine," promotes the fraudulent transfer policy of preferring substance over form, as the court focuses "not on the form of the transaction but on its substance—especially the knowledge and intent of the parties involved in the transaction." *In re Nat'l Forge Co.*, 344 B.R. 340, 347 (W.D. Pa. 2006) (citations omitted). Moreover, it enables courts to "'slice through complicated transactions to compare what value the debtor gave and what

---

Latoc's arguments—they simply reaffirm the proposition that the court must engage in a fact-specific analysis to determine whether, at the time of the transfer, it was reasonable and legitimate to expect that the transfer would confer reasonably equivalent value (directly or indirectly) to the debtor. *See In re Fairchild Aircraft Corp.*, 6 F.3d at 1126 (affirming the finding that the costs related to the debtor's decision to purchase fuel to keep an airline in business was an exchange for reasonably equivalent value, with the value to the debtor being the potential proceeds of a sale of that airline, because based on the facts and circumstances, the likelihood of the sale was "demonstratably high"); *Mellon Bank NA*, 945 F.2d at 646-49 (finding that the debtor received indirect value from the synergies of joining the two enterprises, but that without the aid of expert witnesses, such value could not be quantified to determine whether it was reasonably equivalent to the transfer). Here, the bankruptcy court did just that: after analyzing the facts and circumstances, it concluded that the Debtor merely acted as a conduit, and thus received no value.

value the debtor got.'" *In re DSI Rental Holdings*, 617 B.R. at 505 (quoting 5 COLLIER ON BANKRUPTCY ¶ 548.03[6], at 548-57 (16th ed.).   While "[a]ctual knowledge has been found to exist where the 'initial transferor was intimately involved in the formulation or implementation of the plan by which the proceeds of the loan were channeled to the third-party," "[c]onstructive knowledge, on the other hand, will be found where the initial transferee became aware of circumstances that should have led it to inquire further into the circumstances of the transaction, but failed to make the inqui*ry." In re Drier LLP*, 453 B.R. 499, 509 (Bankr. S.D.N.Y. 2011) (internal quotation marks and citations omitted).

Latoc argues that because its witnesses denied any intent to defraud, there was no basis for the bankruptcy court to find that a collapse of the transaction was appropriate.   Latoc Br. at 22-24; Latoc Reply at 13-14.   Latoc continues, that instead, the evidence demonstrates the following:

> 1) Latoc actually gave the Mall 2 million dollars; 2) It did not control where the money was meant and how it was used; 3) The Mall exercised dominion and control over the money; 4) It was not obligated to forward the money to the Permalife entities; 5) there was proof of investment that was reasonable and legitimate; 6) The Mall was not a conduit to get the money to the Permalife entities; 7) the Mall had a right to make an investment and that fact that it failed is of no moment; 8) There was no reason or basis to collapse the transaction.

Latoc Br. at 23; Latoc Reply at 14.   However, these conclusions overlook the detailed findings that the bankruptcy court made based on the trial testimony of the Trustee's and Latoc's witnesses, "all of which amply demonstrate that the movement of money from Latoc to the Debtor to PermaLife was an integrated transaction as to which each of the parties had knowledge."   A2909.   The bankruptcy court found as follows:

- The impetus for the loan in 2007 was Mr. Sergi's search for financing for *PermaLife* (rather than the Debtor ) after the fire at its Arizona facility in September 2007.

19

- The principal of the Debtor (Mr. Sergi) and Latoc (the Attars) had common interests in the PermaLife Entities.

- At a PermaLife Board meeting (which R. Attar and possibly D. Attar had attended by telephone), the PermaLife Board refused to approve a loan from an Attar-affiliated entity . . . .

- After the direct loan was rejected, Mr. Sergi approached D. Attar for a loan when they were vacationing in Italy.

- Debtor, rather than PermaLife, obtained the loan from Latoc to "manage the conflict" that prevented PermaLife from borrowing directly from Latoc.

- The Latoc Loan Proceeds were deposited into Debtor's account and then transferred immediately to the accounts of PermaLife and Piedmont.

- When asked on direct examination what discussions he had with D. Attar about use of the proceeds, Mr. Sergi began to discuss PermaLife and his common interest in those entities with D. Attar:

  > I would say the discussions we had is I was going to do what I thought was right for the Mall and that I wanted it to go into things, including what I believed even -- there were certain restrictions in Permalife where *we* couldn't put money directly into Permalife. So Marty or Dibo, *we* would have difficulty putting things into Permalife. Okay.

  > […]

- When asked on cross-examination how he used the Loan Proceeds, Mr. Sergi recited a sequence of uses related to PermaLife and the rubber recycling entities. He concluded: "[I]f any portion of that loan was going to help PermaLife which just also happened to help the Mall, I would think Gemini and the whole crew [the PermaLife Board] would be very happy with that."

A909-11 (emphases in original). The Court agrees that such findings have adequate support in the record and support the conclusion that Latoc had knowledge of the integrated transaction. As such, the Court affirms the bankruptcy court's decision to collapse the transactions and treat the transfers as a single, integrated transaction.

### C. Pre-Judgment Interest

In avoidance actions, the court may award prejudgment interest to the Trustee, as such an award "furthers the congressional policies of the Bankruptcy Code by compensating the estate for the time it was without use of the transferred funds." *In re USN Commc'ns, Inc.*, 280 B.R. 573, 602 (Bankr. D. Del. 2002). While the Bankruptcy Code does not expressly reference prejudgment interest, "courts have relied on the word 'value' in § 550(a) as authorizing an interest award." *In re Hechinger Inv. Co. of Del. Inc.*, 489 F.3d 568, 579-80 (3d Cir. 2007). An award of prejudgment interest is not "punitive" or a matter of "who deserves the money more"—it is a means to compensate the plaintiff for the lost time-value of the money. *See In re Milwaukee Cheese Wisc. Inc.*, 112 F.3d 845, 849 (7th Cir. 1997). Thus, while such an award is within the discretion of the bankruptcy court, it "'should be awarded unless there is a sound reason not to do so.'" *In re Hechinger Inv. Co. of Del. Inc.*, 489 F.3d at 580 (quoting *In re Milwaukee Cheese Wisc.*, 112 F.3d at 849)).

Latoc argues that the Court "should look at how much money Latoc lost," and recognize that this "was not a gain for Latoc by any means." Latoc Br. at 24-25; *see also* Latoc Reply at 15-16. This precise argument was rejected by the bankruptcy court[20] and fails to establish an abuse of discretion. In awarding prejudgment interest, the bankruptcy court considered the Trustee's argument that "Latoc has enjoyed the benefit of the funds [$592,875.03], and the ability to let the funds earn interest, invest them, and make profits from the funds" for approximately ten years.". A2914. It also considered, and rejected, Latoc's "lost money" argument. *See supra* n. 20.

---

[20] *See* A2914 ("The money that Latoc argues it 'lost' on the transaction is not 'good reason' to deny the Trustee prejudgment interest under applicable law. If it were, there would be few cases in which prejudgment interest would be awarded in avoidance actions" because "in most avoidance actions, in addition to being required to return the avoided payments, the defendant is often owed other sums that the debtor did not pay pre-petition.").

2859-JMV   Document 9   Filed 04/17/23   Page 22 of 22 PageID: 3197

Moreover, the bankruptcy court acknowledged that there was no "gratuitous delay" on the part of the Trustee, which in some instances, constitutes grounds to limit an award of interest. A2915. It observed that instead, the proceedings were delayed as a result of discovery disputes, some of which resulted in the imposition of sanctions against Latoc. A2915. The Court finds that the bankruptcy court exercised sound discretion and affirms the award of prejudgment interest.

## V.    CONCLUSION

For the foregoing reasons, the bankruptcy court's April 29, 2022 judgment is **AFFIRMED**. An appropriate Order accompanies this Opinion.

Dated: April 14, 2023

John Michael Vazquez, U.S.D.J.

22